UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

GAJANAN VENGURLEKAR and UMESH
PACHPANDE, individually and on behalf of
all others similarly situated,

               Plaintiffs,

   -v-                                                                         No. 03 Civ. 243 (LTS)(DFE)

HSBC BANK USA and GETZLER &
COMPANY, INC.,

               Defendants.

-------------------------------------------------------x

## OPINION AND ORDER

        Plaintiffs Gajanan Vengurlekar and Umesh Pachpande (collectively "Plaintiffs") represent a certified class consisting of all current and former employees who worked for Silverline Technologies, Inc., in the United States who were owed wages, and who are still owed wages, or whose pension plan contributions were outstanding, and are still outstanding, during the period from June 18, 2002, to April 27, 2004.  Plaintiffs assert claims of breaches of fiduciary duty pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(2), 29 U.S.C. § 1132(a)(2)  (and ERISA § 409, 29 U.S.C. § 1109, referenced in that provision) by HSBC Bank USA ("HSBC") and Getzler & Company, Inc. ("Getzler") (collectively "Defendants").  These claims were tried to the bench in November 2008; the parties thereafter submitted proposed findings of fact and conclusions of law and post-trial memoranda in support.  The Court has jurisdiction of Plaintiffs' ERISA claims pursuant to 29 U.S.C. § 1132(e) and (f).  The Court observed carefully the demeanor and testimony of the witnesses and has considered thoroughly all of the parties' submissions and arguments as well as the trial record.  For the reasons that follow,

Plaintiffs' ERISA claims against Defendants are dismissed.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## FACTS

The following findings of fact are based on the trial record.

Plaintiffs are former employees of Silverline Technologies Inc., Silverline Technologies Limited or Seranova, Inc. (collectively "Silverline"). Silverline was in the business of providing information technology consulting services to various clients, such as American Express and Volkswagen. Silverline maintained a 401(k) pension plan, pursuant to which Plaintiffs could designate portions of their paychecks to be withheld for contribution into that plan and Silverline would make additional contributions in conjunction therewith. In late 2001 and in 2002, portions of Silverline employees' wages were regularly reported as withheld for plan contributions, but, at times, the withheld amounts were not contributed. Silverline also failed to pay Plaintiffs' wages regularly.

In January 2001 and March 2002, HSBC extended Silverline a credit facility of $30 million and obtained a perfected security interest in, inter alia, Silverline's accounts and general intangibles, including the accounts receivable representing fees payable by Silverline's clients (the "collateral"). Advances to Silverline under the credit facility were made based on a formula that took into account the value of Silverline's receivables. By early 2002, Silverline was undergoing serious financial difficulties. Upon investigation, HSBC found that millions of dollars in value of the receivables Silverline had reported in connection with credit facility advances could not be verified. Silverline had also failed to comply with other conditions of the credit facility agreement.

On May 28, 2002, HSBC sued Silverline in the United States District Court of the Southern District of New York (HSBC Bank USA v. Silverline Technologies, Inc., No. 02-cv-4007), alleging that Silverline had breached the terms of its credit line and seeking immediate seizure of the collateral. At that time, approximately $27 million in principal was unpaid.  The Court denied HSBC's request for an order of immediate seizure but granted a Preliminary Injunction Order on June 5, 2002, ordering Silverline to keep HSBC informed of Silverline's business prospects and conduct and prohibiting Silverline from using or otherwise transferring any part of the collateral, except that Silverline was permitted to use "the cash proceeds from accounts receivable to pay current expenses in the ordinary course of business, as determined to be reasonable and necessary for the continuation of Silverline's business in consultation with [Getzler]."  By that time, Silverline's 401(k) plan delinquencies for employee elective contributions were substantial but did not exceed $900,000.

      Getzler was a management and financial consultant specializing in crisis management.  On May 6, 2002, Getzler, one of three consultants recommended by HSBC, was retained by Silverline to help staunch Silverline's financial deterioration and ascertain accurately Silverline's financial position.  Mark Samson ("Samson") was the lead Getzler representative for this engagement.  In the initial month of the engagement, he considered proposing to Silverline that he assume management control over Silverline on behalf of Getzler. (Tr. at 248:15-249:11.)  However, after the Preliminary Injunction Order was entered, he interpreted the order to permit Getzler only to assume a consultant role without actual control over Silverline's finances and therefore did not pursue the plan of assuming management control.  (Tr. at 249:1-5.)  Samson and Silverline's management later agreed, given that Silverline's books and records were in disarray and that Silverline could not account for millions of dollars of accounts receivable, that Getzler

would maintain physical custody of Silverline's checkbook to ensure, as Samson credibly testified, that "checks just did not go missing" and that "unauthorized people could not take checks and utilize them . . . in a fraudulent manner." (Tr. at 288:18-21.) Getzler did not have the authority to sign any checks on behalf of Silverline, and, in the course of Getzler's engagement, Getzler never refused a request by Silverline for the distribution of a check. (Tr. at 288:11-289:10.)

        Samson could, and did, make recommendations to Silverline as to how available cash should be expended, but Silverline was under no obligation to follow his recommendations. For example, when Samson recommended that Silverline pay its payroll taxes, Silverline did not pay payroll taxes, nor did Samson have any authority to direct that Silverline do so. Essentially, Samson's role was limited to ensuring that Silverline could account for all of its payments and that unauthorized personnel could not make payments on behalf of Silverline and further exacerbate the chaotic nature of Silverline's internal financial controls. Plaintiffs' witnesses' speculative and conclusory testimony as to Getzler's role notwithstanding,[1] the Court credits Samson's testimony that he never had the authority to, nor did he ever, exercise control over Silverline's disposition of funds. There is furthermore no evidence that Samson or any other Getzler employee played any role in the administration of the Silverline 401(k) plan.[2]

---

[1] See, e.g., Tr. at 343:15-18 ("A: . . . Silverline was not in control of our finances. Q: Do you know who was? A: I believe it was HSBC Bank, in conjunction with Getzler.")

[2] Norman D'Souza ("D'Souza"), the head Silverline employee in charge of finances, testified that Samson made the financial decisions for Silverline. However, the Court finds this testimony, as well as any other testimony by D'Souza attributing management authority of Silverline's finances to Getzler, not credible. D'Souza was well aware that Silverline had not been paying its employees or their payroll taxes and that he himself was exposed to a substantial prospect of liability as Silverline's head financial manager and therefore he was motivated to exaggerate Getzler's authority. See New Jersey Statutes Annotated 34:11-4.1 et seq. (officers of a corporation are personally liable for unpaid wages of that corporation's employees). The malingering

During the period between May 6 and September 18, 2002, Silverline and HSBC agreed that HSBC would "sweep," as payments against the credit facility, all proceeds from Silverline's accounts receivable that were deposited in Silverline's HSBC bank account(s) on a regular basis, and approximately $6 million in proceeds from accounts receivable were ultimately swept by HSBC. At no point, however, did HSBC or Getzler have any authority or discretion in the administration or management of any pension plan, and neither entity ever directed Silverline to pay or not pay withheld employee or required employer contributions into any pension plan.

From July 20, 2001 to September 20, 2002, Silverline issued pay stubs to employees that showed wage amounts and 401(k) Plan contributions but neither made the wage payments nor the 401(k) Plan contributions. While some of the wage amounts accrued during that time period were ultimately paid, many of the reported 401(k) Plan contribution amounts were not paid over to the plan.[3]

On September 18, 2002, HSBC and Silverline entered into a Settlement Agreement that was so-ordered by the court and required Silverline to give Getzler exclusive management authority over the control of Silverline's accounts and the disbursement of payments to Silverline's creditors, for a limited time period from September 19 to October 7, 2002. However, Getzler was not actually given such authority by Silverline, and, as Samson credibly testified, Getzler continued

---

tone of D'Souza's answers (especially when confronted with addressing the discrepancies in accounts receivable), his evasive demeanor, the conclusory nature of his attributions of responsibility to Getzler, and his emphatic denial that he was technically the Chief Financial Officer of Silverline, all support the Court's conclusion.

[3]   See, e.g., Ex. 27 (internal business record tabulating unpaid contributions from July 2001 to September 2002). Plaintiffs also rely on New Jersey Department of Labor reports issued in November 2002 indicating withheld contributions that were due and owing to the pension plan, but it is not clear for what time period the report faults Silverline for failing to pay the contributions.

to function as Silverline's consultant throughout this period in the same manner as before.[4] On November 26, 2002, the court entered a Stipulated Order and Judgment awarding HSBC a judgment against Silverline in the amount of approximately $27 million, and ordered Silverline to immediately deliver possession of all the collateral to HSBC. On December 4, 2002, HSBC and Getzler entered into an agreement under which Getzler worked on HSBC's behalf to liquidate the Silverline collateral that was delivered to HSBC pursuant to the judgment.

## DISCUSSION

Plaintiffs assert that Defendants were fiduciaries within the meaning of ERISA who breached their duties as such by failing to deposit withheld employee contributions into the plan. Under 29 U.S.C. § 1132(a)(2) (West 1999), "[a] civil action may be brought . . . by a participant . . . for appropriate relief under section 1109 of this title." Section 1109 provides, in relevant part, that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C.A. § 1109(a) (West 1999). In relevant part, ERISA defines "fiduciary" as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any

---

[4] See Tr. at 673:17-19 ("Q [to Samson]: After the entry of this September settlement agreement, how did Getzler's work or assignment change? A: It didn't change. The company continued to create the payroll lists and the lists of critical vendors, and we continued to reconcile the bank accounts. What had changed, though, was that the company was clearly now in a liquidation mode and what we concentrated on was to try and transition employees to some of the existing clients."); Tr. at 681:3-6 ("Q: After September 18, 2002, the settlement agreement and order, did Getzler have any responsibilities over any of Silverline's employee benefit plans? A: No.").

>discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A) (West 1999).

Plaintiffs cite Department of Labor regulations which provide that employee contributions are plan assets as soon as they are withheld, see 29 C.F.R. § 2510.3-102, argue that Defendants became fiduciaries by virtue of their alleged control over the disposition of general Silverline assets, and assert that Defendants are liable because much or most of Silverline's assets (primarily the proceeds from accounts receivable) were paid to HSBC in partial satisfaction of the outstanding loan instead of to the 401k plan.

Plaintiffs' attempts to establish liability fail because, even assuming that the company's general assets could be deemed to have included plan assets by reason of the reported but unfulfilled withholdings, Plaintiffs have failed to prove that either of the Defendants exercised discretionary control over the management or disposition of the company's assets or had any discretionary authority, responsibility or control respecting 401(k) Plan management or administration at any time from July 20, 2001 to September 20, 2002, the period during which contributions became due and owing to the plan. Although Getzler had physical control of the company's checkbook, it had no check signing authority or any other authority to control the disposition of any of the company's assets at any relevant time. Getzler's scope of authority did not change even in the short time period between September 19 to October 7, 2002, notwithstanding the Settlement Agreement's order that Silverline allow Getzler to assume exclusive management authority over Silverline's assets during that brief time period. HSBC was even further removed from Silverline's operations, and there is no evidence that HSBC had any decision-making

authority with respect to how Silverline was to disburse its general assets at any relevant time. See, e.g., LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997) (defendant was an ERISA fiduciary where he "had a role in determining which bills to pay, in that he decided which creditors were to be paid out of the Company's general account (which, during the relevant time frame, included employee Fund contributions), and when those creditors were to be paid"). Therefore, Plaintiffs have failed to prove that Getzler and HSBC were fiduciaries under ERISA.

Moreover HSBC had a prior perfected security interest in all of the company's assets, including any available cash from which Silverline could have paid contributions, HSBC's outstanding claims against the company at all times exceeded Silverline's available assets, and there is no evidence that the Plan itself was anything other than an unsecured creditor of the company. Any secured creditor's exercise of its superior rights is likely to affect adversely the ability of an unsecured creditor to recover what is owed (indeed, that is the premise of secured transactions), and the mere exercise of these rights created pursuant to ordinary commercial customs, without more, does not automatically endow the secured lender with fiduciary responsibilities to the unsecured creditors of the borrower, including employee benefit plans. Therefore, HSBC is not a fiduciary under ERISA simply because the exercise of its superior rights over Silverline's assets may have made it more difficult for Silverline to make timely payments into the Plan. See, e.g., Useden v. Acker, 947 F.2d 1563, 1575 (11th Cir. 1991) (bank's exercise of rights to liquidate collateral, which directly compromised plan assets, nonetheless did not render it a fiduciary under ERISA).

## CONCLUSION

Plaintiffs have failed to sustain their burden of proving the alleged ERISA

violations. Plaintiffs' individual and class claims under ERISA are accordingly dismissed. Because all of Plaintiffs' claims against Defendants have been resolved in Defendants' favor, the Clerk of Court is respectfully requested to enter judgment in favor of Defendants and close this case.

    SO ORDERED.

Dated:    New York, New York
          February 11, 2009

                                    LAURA TAYLOR SWAIN
                                    United States District Judge